Opinion for the court filed by Circuit Judge MOORE. Dissenting opinion filed by Circuit Judge NEWMAN.
MOORE, Circuit Judge.
Mr. Frank Gaylord appeals the decision of the United States Court of Federal Claims that a stamp issued by the United States Postal Service made fair use of a copyrighted work, specifically, soldier sculptures in formation constituting part of the Korean War Veterans Memorial (Memorial). The court determined that Mr. Gaylord was the sole author of the soldier sculptures and that his sculptures were not exempt from copyright protection under the Architectural Works Copyright Protection Act (AWCPA). Because the court erred when it determined that the stamp made fair use of Mr. Gaylord’s work, but it correctly determined that the government was not a joint author and that the AWC-PA did not bar an infringement suit, we affirm-in-part, reverse-in-part, and remand for a determination of damages.
BACKGROUND
This case arises from the Postal Service’s decision to issue a 87-cent stamp depicting a portion of the Memorial. The path from the concept of the Memorial to the creation of the stamp spans more than 15 years.
In 1986, Congress enacted legislation to erect a memorial in Washington, D.C. to honor veterans of the Korean War. Authorization of Memorial, Pub.L. No. 99-572, § 1, 100 Stat. 3226 (1986). The legislation authorized the American Battle Monuments Commission (Commission) to establish the Memorial, and the Commission sponsored a contest to select the designer of the Memorial. A team from the Pennsylvania State University (the Penn State Team) won the contest with a proposal to create 38 larger-than-life granite soldiers in formation. According to the Penn State Team, “[f]rom a distance, one [would see] the Memorial as an elusive, dream-like presence of ghostly figures moving across a remote landscape.” Although its original concept undoubtedly influenced the design of the Memorial, the Penn State Team eventually withdrew from the project.[1]
The Army Corps of Engineers selected Cooper-Lecky Architects, P.C. (Cooper-Lecky) as the prime contractor for the creation, construction, and installation of the Memorial. Cooper-Lecky sponsored a competition to select the sculptor for the Memorial. Mr. Gaylord, a nationally recognized sculptor, won the contest.
In 1990, Mr. Gaylord began work on the project. Although the Penn State Team’s proposal called for 38 granite soldiers, “the final design featured 19 stainless steel statues representing a platoon of foot soldiers in formation,” referred to as The Column. Gaylord, 85 Fed.Cl. at 63. Mr. Gaylord prepared successively larger models of the soldiers, transforming them *1369 along the way in response to critiques and suggestions by Cooper-Lecky, members of the Korean War Veterans Memorial Advisory Board (VAB), and the Commission on Fine Arts (CFA). Once Mr. Gaylord completed models for the soldiers, they were cast in stainless steel and installed at the site of the Memorial on the National Mall in Washington, D.C. At the suggestion of a member of the VAB, Mr. Gaylord staggered the statues, thereby creating the composition of The Column. Cooper-Lecky, the VAB, and the CFA all participated in incorporating The Column into the Memorial, which also includes landscaping, a mural, and granite plates representing the reflection of rice paddies at the soldiers’ feet. A picture of The Column— taken on a sunny day — is below.
[[Image here]]
Mr. Gaylord received five copyright registrations relating to the soldier sculptures from 1990 to 1995. Each certificate listed Mr. Gaylord as the sole author. The registrations include pictures of the clay models for the sculptures as they evolved over the years, and eventually, the sculptures themselves. For example, in his November 11, 1993 registration, he described the work as clay “statuettes — fully approved— 19 soldiers — -National Korean War Veterans Memorial.” His August 12, 1994 registration concerned “19 7'-6" tall clay soldiers to be cast in stainless steel for the National Korean War Veterans Memorial on the mall in Washington, D.C.” Shortly after the statues were installed, on May 1, 1995, Mr. Gaylord filed a certificate of copyright registration for the soldiers as they appeared before and after casting. This certificate included photographs of the soldiers as installed on the National Mall.
In 1995, shortly after the Memorial was dedicated, a photographer named John Alii took a photograph of the Memorial as a retirement gift for his father, a veteran of the Korean War. Mr. Alii visited the Memorial on five or six occasions, taking photographs at various times of year and day. One such visit occurred in January 1996 just after a snowstorm. Over the course *1370 of about two hours on that cold winter morning, Mr. Alii took about 100 photographs of the Memorial, including photographs of individual soldiers, from various angles using different exposures and lighting conditions. Mr. Alii selected one of his photographs for his father’s retirement gift. The photograph, titled “Real Life,” is reproduced below. No one questions that Mr. Alii is entitled to his own copyright protection in his photograph as a derivative work.
[[Image here]]
Mr. Alii decided to sell prints of the photograph. He therefore sought permission from the copyright owner of the underlying work, eventually locating Mr. Lecky of Cooper-Lecky, who held himself out as the “outright” owner of the copyright. Mr. Alii agreed to pay a 10% royalty on sales of prints of his photographs to a licensing entity established by Mr. Lecky. Mr. Lecky did not notify Mr. Gay-lord about the agreement with Mr. Alii.[2]
In 2002, the Postal Service decided to issue a 37-cent stamp commemorating the 50th anniversary of the armistice of the Korean War. The Postal Service selected Mr. Alli’s photograph for the stamp and paid him $1500 for its use. Mr. Alii told the Postal Service that it would need the permission of the owner of the copyright of the underlying work and referred the Postal Sendee to Mr. Lecky.
The Postal Service issued the stamp, titled “Korean War Veterans Memorial.” The stamp features Mr. Alli’s photo and depicts 14 of the 19 soldier sculptures (see below).
*1371 [[Image here]]
The Postal Service produced approximately 86.8 million stamps before retiring the stamp on March 31, 2005. The Postal Service acknowledged that it received over $17 million from the sale of nearly 48 million stamps. It was estimated that in 2003, the Postal Service generated $5.4 million from the sales of stamps to collectors who did not use the stamps to send mail. In addition, the Postal Service sold retail goods such as commemorative panels and framed art featuring images of the stamp. It did not seek or obtain Mr. Gaylord’s permission to use the sculptures in the stamp or in any related retail goods.
Mr. Gaylord sued the government in the Court of Federal Claims on July 25, 2006, alleging infringement of his copyright. On June 16-20, 2008, the Court of Federal Claims conducted a trial, at which the government argued that the stamp made fair use of the work, excepting it from copyright liability. The government further argued that it had rights to the work as a joint author, which would provide it an unlimited license in the work. Finally, the government argued that the stamp fell under the exclusion from liability for copyright infringement for architectural works under the AWCPA. The Court of Federal Claims determined that Mr. Gaylord was the sole copyright owner of The Column and that The Column did not qualify as an architectural work under the AWCPA. Gaylord v. United States, 85 Fed.Cl. 59, 67, 72 (2008). However, the Court of Federal Claims also determined that the government was not liable for copyright infringement because the government’s use of The Column was fair use. Id. at 71. Mr. Gaylord appeals the court’s decision as to fair use, and the government challenges the court’s determinations of ownership and the inapplicability of the AWCPA. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).
DISCUSSION
We review the Court of Federal Claims’ legal conclusions de novo and its factual findings for clear error. Columbia Gas Sys., Inc. v. United States, 70 F.3d *1372 1244, 1246 (Fed.Cir.1995). Infringement requires two elements: “(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.” Feist Publ’ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). The government does not dispute the validity of the copyright or that the stamp copied original elements of The Column. This appeal concerns whether the government can establish fair use, ownership rights through a joint author, or an exemption to liability under the AWCPA.
I. Fair Use
Fair use of a copyrighted work “for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright.” 17 U.S.C. § 107. “The fair use doctrine thus ‘permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which the law is designed to foster.’ ” Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 577, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) (alteration in original) (citation omitted).
Fair use is a mixed question of law and fact. Harper & Row, Publishers, Inc. v. Nation Enter., 471 U.S. 539, 560, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). Because “the doctrine is an equitable rule of reason, no generally applicable definition is possible, and each case raising the question must be decided on its own facts.” Id. at 560, 105 S.Ct. 2218 (citation omitted). Section 107 requires courts to consider four nonexclusive factors when evaluating fair use:
(1)the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
(2) the nature of the copyrighted work;
(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
(4) the effect of the use upon the potential market for or value of the copyrighted work.
17 U.S.C. § 107. Each factor is “to be explored, and the results weighed together, in light of the purposes of copyright.” Campbell, 510 U.S. at 577, 114 S.Ct. 1164.
A. Purpose and Character of the Infringing Use
When evaluating the purpose and character of the use, one must consider “whether the new work merely ‘supersede^] the objects’ of the original creation or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is ‘transformative.’ ” Id. at 579, 114 S.Ct. 1164. Although “transformative use is not absolutely necessary for a finding of fair use, the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works. Such works thus lie at the heart of the fail' use doctrine’s guarantee of breathing space within the confines of copyright.” Id. (citation omitted).
The Court of Federal Claims concluded that this factor weighed heavily in favor of fair use because the stamp was transformative. Gaylord, 85 Fed.Cl. at 69. The court determined that “while both the Stamp and ‘The Column’ are intended to honor veterans of the Korean War, the Stamp is transformative, providing a different expressive character than ‘The Column.’ ” Id. at 68. It explained that Mr. Alii transformed the three-dimensional sculpture with his photograph by “creating *1373 a surrealistic environment with snow and subdued lighting where the viewer is left unsure whether he is viewing a photograph of statues or actual human beings.” Id. at 68-69. The court determined that the Postal Service further transformed The Column by “making it even grayer, creating a nearly monochromatic image. This adjustment enhanced the surrealistic expression ultimately seen in the Stamp by making it colder.” Id. at 69. The Court of Federal Claims concluded that the stamp was “a transformative work, having a new and different character and expression than Mr. Gaylord’s ‘The Column.’ ” Id.
We disagree. As a preliminary matter, we note that the inquiry must focus on the purpose and character of the stamp, rather than that of Mr. Alli’s photograph. The stamp does not reflect any “further purpose” than The Column. See Campbell, 510 U.S. at 579, 114 S.Ct. 1164. As the Court of Federal Claims found, both the stamp and The Column share a common purpose: to honor veterans of the Korean War.
Works that make fair use of copyrighted material often transform the purpose or character of the work by incorporating it into a larger commentary or criticism. For example, in Blanch v. Koons, an artist incorporated a copyrighted photograph of a woman’s feet adorned with glittery Gucci sandals into a collage “commenting on the ‘commercial images ... in our consumer culture.’ ” 467 F.3d 244, 248 (2d Cir.2006). The court determined that this was fan-use in part because' the collage was trans-formative. Id. at 252-53. It reasoned that the collage and the photo had “sharply different” purposes and that the collage was intended to be a “commentary on the social and aesthetic consequences of mass media.” Id. Such transformation of a copyrighted work into a larger commentary or criticism fall squarely within the definition of fair use.
The government points to Lennon v. Premise Media Corp., 556 F.Supp.2d 310 (S.D.N.Y.2008), as an example of a case where a secondary use was deemed trans-formative fair use without commenting on the original. In Lennon, defendants-fllm-makers used a 15-second clip of John Lennon’s “Imagine” that they believed envisioned a world without religion. Id. at 322 (“Nothing to kill or die for/And no religion too”). The filmmakers played this audio clip while showing Cold War-era images of marching soldiers and an image of Stalin, “expressing] the filmmakers’ view that the song’s secular utopian vision ‘cannot be maintained without realization in a politicized form’ and that the form it will ultimately take is dictatorship.” Id. at 323. The court concluded that “[t]he movie thus use[d] the excerpt of ‘Imagine’ to criticize what the filmmakers see as the naiveté of John Lennon’s views.” Id. This use appears clearly transformative, and (as in Blanch) falls safely within the definition of fair use. By contrast, here the stamp did not use The Column as part of a commentary or criticism.[3]
We conclude that the stamp does not transform the character of The Column. Although the stamp altered the appearance of The Column by adding snow and muting the color, these alterations do not *1374 impart a different character to the work. To the extent that the stamp has a surreal character, The Column and its soldiers themselves contribute to that character. Indeed, the Penn State Team suggested that the Memorial have a “dream-like presence of ghostly figures.” Capturing The Column on a cold morning after a snowstorm — rather than on a warm sunny day — does not transform its character, meaning, or message. Nature’s decision to snow cannot deprive Mr. Gaylord of an otherwise valid right to exclude.
Analysis of the purpose and character of the use also includes whether the “use is of a commercial nature or is for nonprofit educational purposes.” 17 U.S.C. § 107. The Postal Service acknowledged receiving $17 million from the sale of nearly 48 million 37-cent stamps. An estimated $5.4 million in stamps were sold to collectors in 2003. The stamp clearly has a commercial purpose. The Court of Federal Claims did not address how the commercial purpose of the stamp affected this factor of the fair use analysis.
Because the stamp did not have a further purpose or different character, and because it had a commercial use, we conclude that this factor weighs strongly against fair use.
B. Nature of the Copyrighted Work
We next consider the nature of the copyrighted work, The Column. “This factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied.” Campbell, 510 U.S. at 586, 114 S.Ct. 1164. Relevant to this factor, courts consider: “(1) whether the work is expressive or creative, such as a work of fiction, or more factual, with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower.” Blanch, 467 F.3d at 256.
The Court of Federal Claims acknowledged the expressive and creative nature of The Column, which weighs against fair use. Gaylord, 85 Fed. Cl. at 69. We see no clear error in the Court of Federal Claims’ finding that The Column is expressive and creative. However, it noted that “when a creative work has been copied, the second factor may be of limited utility to the fair use analysis where the challenged work is transformative.” Id. (citing Blanch, 467 F.3d at 257). Therefore, because it had previously determined that the stamp was transformative, it gave this factor “limited weight” in its fair use analysis. Id.
In Blanch, the Court of Appeals for the Second Circuit determined that the creative nature of a copyrighted work had limited weight in the fair use analysis because the secondary work used the original “in a transformative manner to comment on her image’s social and aesthetic meaning rather than to exploit its creative virtues.” 467 F.3d at 257. In this case, the stamp did not use The Column in a trans-formative manner — the purpose and character of the use were identical. Thus, we see no reason to discount the expressive and creative nature of The Column.
Although The Column is part of a national monument — perhaps the epitome of a published work — given the overall creative and expressive nature of the work, we conclude that this factor weighs against fair use. See Twin Peaks Prods., Inc. v. Publ’n Int’l, Ltd., 996 F.2d 1366, 1376 (2d Cir.1993) (concluding that for a very successful, published, creative work, this factor weighed against fail' use).
*1375 C. The Amount and Substantiality of the Portion Used
The third factor concerns whether “the amount and substantiality of the portion used in relation to the copyrighted work as a whole ... are reasonable in relation to the purpose of the copying.” Campbell, 510 U.S. at 587, 114 S.Ct. 1164. Courts consider both the quantity and quality of the materials used. Id.
As to the quantity, the Court of Federal Claims found that the stamp depicted a substantial number (14 of the 19) of the soldier sculptures, weighing against fair use. As to the quality, the court determined that “Mr. Alii and the Postal Service used variables to lessen the quality and importance of ‘The Column’ and to alter the expression of the Stamp,” changing “the qualitative message of ‘The Column.’ ” Gaylord, 85 Fed.Cl. at 70. The court concluded that while the use of many of the soldier statues weighed against fair use, the weight of this factor was “somewhat mitigated” by the quality and importance of the statues to the stamp. Id.
We agree that the government’s use of many of the soldiers in the stamp weighs against fair use, however, we disagree that the weight is mitigated by the quality and importance of The Column to the stamp. The Column constitutes the focus—essentially the entire subject matter-—of the stamp. The stamp itself is titled “Korean War Veterans Memorial.” Although the snow and muted coloring lessen the features of the soldier sculptures, the stamp clearly depicts an image of The Column. Thus, we conclude that this factor weighs against fair use.
D. Market Impact
The fourth fair use factor is “the effect of the use upon the potential market for or value of the copyrighted work.” 17 U.S.C. § 107. This factor requires courts to consider “whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market.” Campbell, 510 U.S. at 590, 114 S.Ct. 1164 (quoting 3 M. Nimmer & D. Nimmer, Nimmer on Copyright § 13.05[A][4] (1993)). “In evaluating this factor, a court must consider not only the primary market for the copyrighted work, but the current and potential market for derivative works.” Turin Peaks, 996 F.2d at 1377.
The Court of Federal Claims found that the stamp caused no harm to either the value of The Column or the market for derivative works. Gaylord, 85 Fed.Cl. at 70. It noted that Mr. Gaylord conceded that the stamp actually increased the value of The Column. Id. The court further determined that the stamp did not impact Mr. Gaylord’s prior efforts to market derivative works, and that it was not likely to impact such efforts in the future because the stamp was an inadequate market substitute for The Column. Id. at 70-71. The court reasoned that the stamp was analogous to the thumbnail images in Kelly v. Arriba Soft Corp., 336 F.3d 811, 821 (9th Cir.2003), and Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146 (9th Cir.2007). The court therefore concluded that this factor weighed in favor of fair use. Gaylord, 85 Fed.Cl. at 71.
We see no clear error in the court’s determination that the stamp has not and will not adversely impact Mr. Gaylord’s efforts to market derivative works of The Column. Someone seeking to take a photograph of The Column or otherwise create a derivative work would not find the stamp to be a suitable substitute for The Column itself. Thus, we agree that this factor favors fair use.
*1376 E. No Fair Use
Weighing the factors, we conclude that the government’s use of The Column in the stamp was not a fair use. Even though the stamp did not harm the market for derivative works, allowing the government to commercially exploit a creative and expressive work will not advance the purposes of copyright in this case. We turn now to whether The Column is a joint work or governed by the AWCPA.
II. Joint Authorship
The government asserts that it has rights to The Column through the contributions of Cooper-Lecky, the VAB, and/or the CFA (collectively, the government entities). Joint authors each possess an independent right to use or license the copyrighted work, subject only to a duty to account to the other coauthor(s) for any profits earned on the work. Cmty. for Creative Non-Violence v. Reid, 846 F.2d 1485, 1498 (D.C.Cir.1988) (CCNV), aff'd, 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). Cooper-Lecky granted the government a license to use any work that Cooper-Lecky might hold copyright in, and the VAB and CFA are government entities. Thus, if Cooper-Lecky, the VAB, or the CFA are joint authors with Mr. Gaylord, the government would have a right to use The Column free from Mr. Gaylord’s claims of infringement, subject to its duty to account to Mr. Gaylord.
On appeal, the government alleges that the trial court erred by misreading the certificates of registration, by failing to treat the presumption of validity as rebut-table, and by concluding that The Column was not a joint work. We conclude that the Court of Federal Claims treatment on each issue was proper.
The Court of Federal Claims first noted that Mr. Gaylord was entitled to a prima facie presumption of the validity of his copyright registrations. Gaylord, 85 Fed.Cl. at 66; see also 17 U.S.C. § 410(c) (“In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The eviden-tiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.”). On appeal, the government challenges this presumption, arguing that statements of Mr. Gaylord’s sole authorship are rendered facially ambiguous because certain of his copyright registration certificates indicate that the underlying work was “fully approved” or “[f]ully approved by all federal commissions.” These notations appear in the section titled “Nature of Authorship,” describing the nature of the work, rather than in the space provided for the “Name of Author.” The statements of approval do not undermine Mr. Gaylord’s assertions on his registration forms that he is the sole author of The Column. Approval — much like comment and criticism — does not amount to authorship. See PODS, Inc. v. Porta Stor, Inc., 484 F.3d 1359, 1370 (Fed.Cir.2007).
The government next argues that the Court of Federal Claims erred by failing to treat the presumption of validity as rebut-table. It asserts that “Gaylord bears the burden of establishing sole ownership of ‘The Column’ ” because “the court should have shifted the burden back to Gaylord in light of the government’s evidence.” We disagree. The Court of Federal Claims thoroughly discussed the government’s evidence and concluded that “Defendant’s proffered contributions of the various committees to ‘The Column’ are not evidence of joint ownership, but rather of suggestion and criticism.” Gaylord, 85 Fed.Cl. at 67. The Court of Federal Claims commit *1377 ted no error in its treatment of the burdens or in the presumption of validity — the court treated the presumption as unrebut-ted, not unrebuttable.
Finally, the government argues that the Court of Federal Claims erred in not concluding that the copyright at issue was a joint work. We see no clear error in the Court of Federal Claims’ finding that The Column is not a joint work. “A ‘joint work’ is a work prepared by two or more authors with the intention that them contributions be merged into inseparable or interdependent parts of a unitary whole.” 17 U.S.C. § 101. Authorship is a question of fact. S.O.S., Inc. v. Payday, Inc., 886 F.2d 1081, 1086 (9th Cir.1989); see also Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc., 290 F.3d 98, 110 (2d Cir.2002).
Joint authorship requires “an original work of authorship” from each author. CCNV, 846 F.2d at 1495. “To be an author, one must supply more than mere direction or ideas: one must ‘translate [] an idea into a fixed, tangible expression entitled to copyright protection.’ ” S.O.S., 886 F.2d at 1087 (quoting CCNV, 490 U.S. at 737, 109 S.Ct. 2166); see also PODS, 484 F.3d at 1370 (“Mere participation in, contributions to, and review of the work of [another person] would not necessarily create a joint work.”). As a general rule, each joint author must make an independently copyrightable contribution to the work.[4] See Aalmuhammed v. Lee, 202 F.3d 1227, 1234 (9th Cir.1999); Thomson v. Larson, 147 F.3d 195, 200 (2d Cir.1998); Erickson v. Trinity Theatre, Inc., 13 F.3d 1061, 1071 (7th Cir.1994); M.G.B. Homes, Inc. v. Ameron Homes, Inc., 903 F.2d 1486, 1493 (11th Cir.1990). Thus, “[a] co-authorship claimant bears the burden of establishing that each of the putative co-authors (1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors.” Thomson, 147 F.3d at 200.
The government argues that the contributions of the various government entities merged with Mr. Gaylord’s contributions to create a joint work, analogizing to CCNV, 846 F.2d 1485. In CCNV, the Community for Creative Non-Violence (CCNV) decided to sponsor a display to “dramatize the plight of the homeless.” CCNV, 846 F.2d at 1487. Members of the CCNV conceived of a detailed plan for the display, involving a modern Nativity scene depicting two homeless adults and one infant huddling for warmth over a steam grate placed atop a pedestal from which simulated steam would flow through the grate. Id. The CCNV also decided that the display would include a shopping cart containing the belongings of the homeless family. Id. at 1497 n. 16. A sculptor, James Earl Reid, sculpted the three human figures and the shopping cart, making changes along the way to accommodate CCNV’s requests. Id. at 1487-88. A cabinetmaker created the steam grate pedestal. Id. at 1488. The two portions were joined and the entire work was placed on display. Id. A dispute later arose over the copyright in the work, and CCNV sought a declaration of copyright ownership. Id. *1378 The primary issue in the ease was whether the display was a work made for hire, which would have given CCNV rights to the display. The United States Court of Appeals for the District of Columbia Circuit concluded that the display was not a work made for hire because the statutory requirements set forth in 17 U.S.C. § 101(2) were not met, but remanded for the lower court to determine whether CCNV might have rights as a joint author. Id. at 1494-98. It noted that CCNV contributed the steam grate pedestal, created the initial concept of the display, and provided ongoing direction of the realization of the display. Id. at 1497. It also noted “various indicia of the parties’ intent, from the outset, to merge their contributions into a unitary whole, and not to construct and separately preserve discrete parts as independent works.” Id.
The Supreme Court granted certiorari and determined that the display was not a work made for hire, but noted that “CCNV nevertheless may be a joint author of the sculpture if, on remand, the District Court determines that CCNV and Reid prepared the work ‘with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.’ ” Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 753, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). The case settled without a decision on the merits of the joint authorship issue. See Cmty. for Creative Non-Violence v. Reid, Civ. No. 86-1507, 1991 WL 415523 (D.D.C. Jan. 7, 1991).
The government asserts that the facts of CCNV are “nearly identical” to this case. As an analogy to the steam grate pedestal that CCNV contributed, the government points to the physical contributions of Cooper-Lecky: a reflecting pool, landscaping around The Column, and irregular polished granite bands representing rice paddies. Notably, none of these features appear in the stamp. Even more notably, none of these features appear in the copyright that Mr. Gaylord obtained. Cooper-Lecky’s physical contributions relate to the Memorial as a whole, not The Column. Mr. Gaylord did not copyright the Memorial. His copyright does not include the reflecting pool, the landscaping, or the rice paddies. The copyright over which we are deciding ownership is the copyright of The Column. None of these contributions by Cooper-Lecky establish entitlement to joint authorship over The Column — they are completely independent from the copyrighted matter in this case.
Focusing on The Column, the government lists several contributions by Cooper-Lecky, the VAB, and the CFA as evidence of joint authorship. The VAB created the story of each soldier, including the ethnicity, military service, and equipment representative of soldiers in the Korean War. At one point, the VAB told Mr. Gaylord to change the ethnicity of one soldier from Italian to Hispanic. The VAB also told Mr. Gaylord to sculpt certain soldiers clean shaven and others with buckled chin-straps. Although the government argues that Mr. Gaylord, Mr. Nelson, and Cooper-Lecky all decided that the soldiers would wear ponchos, we see no clear error in the Court of Federal Claims’ finding that “the poncho concept was based on models produced by Mr. Gaylord.” Gaylord, 85 Fed.Cl. at 67. According to the government, Cooper-Lecky instructed Mr. Gaylord to reduce the amount of wind in the ponchos and to reduce the age of the soldiers by removing wrinkles from their faces. Cooper-Lecky and the CFA had Mr. Gaylord change the position of the first soldier in The Column from a celebratory squatting pose to standing. Finally, a member of the VAB suggested that Mr. Gaylord stagger the placement of the *1379 statues in formation. The government asserted that Cooper-Lecky, the VAB, and the CFA “each collaborated to modify the entire compositional structure and setting of ‘The Column.’ ” Id. at 66. The Court of Federal Claims found, however, that “Mr. Gaylord created the composition of ‘The Column,’ using Colonel Bill Weber’s [a member of the VAB] suggestion to stagger the statues.” Id. The Court of Federal Claims addressed the contributions of Cooper-Lecky, the VAB, and the CFA and concluded that they did not constitute evidence of joint authorship “but rather of suggestion and criticism.” Id. at 67. The court explained that “Mr. Gaylord was able to translate the competing and conflicting ideas, comments, and suggestions of multiple committee members into a new set of figures.” Id. The Court of Federal Claims’ conclusions regarding the contributions by Mr. Gaylord and the government entities are not clearly erroneous. While the government entities provided some direction and ideas, this effort did not rise to the level necessary for a joint work.
If one commissioned a work for a cowboy riding a horse, that contribution would not constitute copyrightable expression. See 17 U.S.C. § 102(b) (no copyright protection for ideas). If one later instructed the artist to depict the cowboy as weathered, wearing a cowboy hat, and riding slowly in calm wind, that would not rise to the level of copyrightable expression. See S.O.S., 886 F.2d at 1087 (“A person who merely describes to an author what the commissioned work should do or look like is not a joint author for purposes of the Copyright Act.”). The contributions to The Column by Cooper-Lecky, the VAB, and the CFA amount to no more here. The VAB may have suggested ethnicities and equipment to make the soldiers appear representative of those in the Korean War, but it was Mr. Gaylord who transformed those ideas into copyrightable expression. Cooper-Lecky may have suggested that Mr. Gaylord depict more youthful soldiers with less wind in their ponchos, but those ideas are not copyrightable. The government makes much of Cooper-Lecky’s role in changing the stance of the first soldier. But as the Court of Federal Claims found, upon receiving suggestions and criticism from Cooper-Lecky and members of the committees, Mr. Gaylord transformed the statues himself. The Court of Federal Claims did not apply a “sole laborer” test as the government alleges, rather, it found that the contributions made by Cooper-Lecky, the VAB, and the CFA to The Column do not amount to independently copyrightable expression. We see no clear error in the Court of Federal Claims’ conclusion that Mr. Gaylord is the sole author and sole owner of the copyright in The Column.
Moreover, the Court of Federal Claims determined that the parties never intended to create a joint work in The Column, as distinct from the Memorial. Gaylord, 85 Fed.Cl. at 67. Section 101 requires that a joint work “is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.” 17 U.S.C. § 101. We see no clear error in the Court of Federal Claims’ determination that Cooper-Lecky and Mr. Gaylord did not intend The Column to be a joint work. As the Court of Federal Claims indicates, “The history of ‘The Column’ project thus shows an open and contentious dispute regarding copyright ownership, ultimately with [Cooper-Lecky’s] concession that Mr. Gaylord was the sole owner of the copyright.” Gaylord, 85 Fed.Cl. at 67. In 1994, before the soldier statues were cast in their final form, Cooper-Lecky and Mr. Gaylord *1380 agreed that “[t]he copyright for this work will be held by the Artist [Mr. Gaylord].” The agreement goes on to specify that the terms of the use of the copyright are articulated under a separate contract. The 1994 agreement was signed by Mr. Lecky of Cooper-Lecky on January 27, 1994, and by Mr. Gaylord on February 7, 1994. According to the government, the final full-sized soldiers were created in August 1994.
The separate agreement referenced in the 1994 contract is a 1995 agreement in which Mr. Gaylord granted Cooper-Lecky royalty-bearing licensing rights in Mr. Gaylord’s copyrighted work. The agreement acknowledged the separate contributions of Cooper-Lecky and Mr. Gaylord to the Memorial, which the agreement characterized as a collective work. The 1995 agreement, like the 1994 agreement, recognizes that Mr. Gaylord “is the sole author of the soldier sculptures to become part of the overall Memorial.” The government asserts that the 1995 agreement cannot dispose of the authorship dispute because it arose after Mr. Gaylord created the final full-sized soldiers, and copyright ownership vests at the moment the work is fixed in any tangible form. Although it arose after the creation of the statues in their final form, the 1995 agreement reflects the understandings of Cooper-Lecky and Mr. Gaylord with respect to authorship of The Column and ownership of its copyright. The 1995 agreement crystallizes the intentions of the parties, which are manifest from the 1994 agreement and actions of the parties preceding the creation of The Column. We see no clear error in the Court of Federal Claims’ determination that the parties never intended The Column to be a joint work.
The dissent argues that the government escapes liability for copyright infringement either by virtue of a contract with Cooper-Lecky or 28 U.S.C. § 1498. These issues were raised sua sponte by the dissent — we received no argument or briefing on either issue. The government cannot escape liability under its DACA31-90-C-0057 contract because Mr. Gaylord is not a party to that contract. Moreover, neither section of DACA31-90-C-0057 cited by the dissent concerns works by Mr. Gaylord. Section 1-28 concerns works to which Cooper-Lecky could assert or establish authorship. Section 1-29 concerns works made for hire, and the government has not provided any evidence establishing that The Column was a work made for hire. See 17 U.S.C. §§ 101, 201. Nor can the government escape liability under 28 U.S.C. § 1498, because there is no evidence that Mr. Gay-lord created The Column in the service of the United States or using government time, material, or facilities. We decline to engage in appellate fact-finding to cobble together an excuse for the government’s copyright infringement.
We conclude that the Court of Federal Claims did not clearly err in determining that authorship of The Column rested solely with Mr. Gaylord.
III. Architectural Works
The government asserts that it should escape liability because The Column is an architectural work. The AWC-PA “did not afford architectural works full copyright protection; rather, it exempted the making of pictorial representations of architectural works from copyright infringement.” Leicester v. Warner Bros., 232 F.3d 1212, 1217 (9th Cir.2000). The AWCPA provides:
The copyright in an architectural work that has been constructed does not include the right to prevent the making, distributing, or public display of pictures, paintings, photographs, or other pictorial representations of the work, if the building in which the work is embod *1381 ied is located in or ordinarily visible from a public place.
17 U.S.C. § 120(a). Thus, if The Column is an architectural work under § 120, then Mr. Gaylord’s copyright does not extend to pictorial representations of his work.
The Copyright Act defines an architectural work as “the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings.” 17 U.S.C. § 101. The applicable regulation defines buildings as “humanly habitable structures that are intended to be both permanent and stationary, such as houses and office buildings, and other permanent and stationary structures designed for human occupancy, including but not limited to churches, museums, gazebos, and garden pavilions.” 37 C.F.R. § 202.11(b)(2). The definition excludes “[structures other than buildings, such as bridges, cloverleafs, dams, walkways, tents, recreational vehicles, mobile homes, and boats.” Id. § 202.11(d)(1).
The Court of Federal Claims found that The Column is not a building, and therefore it is not an architectural work governed by the AWCPA. The court explained that the work “is an artistic expression intended to convey a message rather than to be occupied by individuals.... Much like a walkway or a bridge, the memorial permits individuals to access through it, but is not intended for occupancy.” Gaylord, 85 Fed.Cl. at 72. We see no clear error in the court’s determination that The Column is not an architectural work under the AWCPA.
CONCLUSION
For the foregoing reasons, we reverse the court’s decision with respect to fair use, affirm its conclusions that the government does not have rights as a joint owner and that The Column is not an architectural work under the AWCPA, and remand for a determination of damages.
AFFIRMED-IN-PART, REVERSED-IN-PART, and REMANDED

. The members of the Penn State Team are not parties to this litigation, and no one has suggested that they have copyrights in the Memorial.

. In 2006, Mr. Gaylord sued Mr. Alii for copyright infringement. Mr. Alii settled the dispute and agreed to pay Mr. Gaylord 10% of his net sales.

. Nor does the stamp incorporate The Column into a larger biographical work. ”[C]ourts have frequently afforded fair use protection to the use of copyrighted material in biographies, recognizing such works as forms of historic scholarship, criticism, and comment that require incorporation of original source material for optimum treatment of their subjects.” Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 609 (2d Cir.2006); see also Hofheinz v. A & E Television Networks, 146 F.Supp.2d 442, 446-47 (S.D.N.Y.2001).

. The Seventh Circuit carved out an “exception” to this rule in a case where neither collaborator made independently copyrightable contributions, but the result of the collaboration produced a copyrightable work. Gaiman v. McFarlane, 360 F.3d 644, 658 (7th Cir.2004). The court explained that “it would be paradoxical if though the result of [the contributors'] joint labors had more than enough creativity and originality to be copyrightable, no one could claim copyright.” Id. Because the government does not argue that Mr. Gaylord's work was not worthy of copyright protection, this exception does not apply here.